Filed 11/5/21  In re J.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | D079061 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J520689) |
| Plaintiff and Respondent, | |
| v. | |
| J.R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Ana L. Espana, Judge.  Affirmed.

Michelle D. Pena, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

J.M. was born addicted to heroin and methamphetamines due to his mother's daily substance abuse while he was in utero; he was hospitalized with withdrawal symptoms in the neonatal intensive care unit (NICU) for two months while he received methadone treatment. The juvenile court took jurisdiction of J.M., removed him from the custody of his mother, made a detriment finding in denying placement with J.R. (Father), and ordered supervised visitation and reunification services for both parents.[1]

Father appeals from the juvenile court's order, asserting the court abused its discretion when it "removed" J.M. from Father's custody, without sufficient evidence that his infant son would be in substantial danger in his care and without considering reasonable alternatives to removal, and when it limited Father to supervised visitation. As we shall explain, Father's appeal presents claims of error that are premised on a fundamental misunderstanding of the proceedings below. We conclude substantial evidence supported the juvenile court's order, and we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Initiation of Dependency Proceedings and Detention*

J.M. was born premature in March 2021, and tested positive at birth for amphetamine, methamphetamine, and opiates.[2] Mother admitted using heroin every day during pregnancy, including six hours before J.M.'s birth, and methamphetamines within a couple of days of giving birth. J.M. was

---

[1]    M.S. (Mother) has not appealed these orders and is not otherwise a party to this appeal.

[2]    " 'In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order.' " (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

2

placed in the NICU with withdrawal symptoms, where he stayed for nearly two months, used a feeding tube and received methadone to treat his addiction.

After the San Diego County Health and Human Services Agency (Agency) was notified by the hospital of J.M.'s birth, social workers attempted numerous times over the next week or so to speak with Mother and Father to create a safety plan for J.M. Against medical advice, Mother left the hospital two days after she gave birth and began using heroin again when she ran out of her withdrawal medication.

On March 15 and 17, 2021, social workers called Father on his cellphone four times, leaving voice messages with a request for a return call. Father did not return any of the phone calls. On March 17, a social worker went to see Father at an associated address and asked a man at the home if Father lived there. The man said "he would go check." He went inside the home, came back a few minutes later, and told the social worker that Father "does not live at the address" and that he did not even know Father. The social worker then reached Father on his cellphone and explained she was outside the home and would meet him "if that is where he is." Father "appeared surprised" and "did not give a direct answer on whether or not that was his address and insisted" they meet at the child welfare services (CWS) office. Despite confirming he would be at the CWS office on March 17, Father never showed up. A week later, Father told the Agency he did, in fact, live at the location but did not want the social worker to enter the home because Mother was temporarily staying with him. He said he was taking care of Mother after her caesarian section and described himself as a "softy."

On March 18, 2021, the social worker met with Mother and Father at the CWS office. Mother told the social worker her substance abuse began in

August 2020 when she first tried heroin. She began using methamphetamine a month later. She reported using heroin daily throughout her pregnancy and methamphetamine only "sporadic[ally]." Father reported he first learned of Mother's substance abuse in the beginning of the pregnancy when he found her in the bathroom with drug paraphernalia. Before this incident, Father did not suspect that Mother was using drugs since it was not "noticeable" to him.

Both parents reported they were no longer in a relationship and Father stated Mother's substance abuse was a "part of the reason" they were not together. They were, however, trying to work on their relationship "for the baby" and looking for a place to live. Father agreed to drug test, Mother agreed to schedule an intake appointment at a substance abuse treatment center, and both told the social worker they would provide an address where they were currently residing. However, the parents "lacked follow through" and failed to provide any of the needed information, and Father did not get drug tested that day.[3] On March 19, 2021, four more phone calls to Father went unanswered and despite voice messages requesting a return call, Father did not call the social worker back.

---

[3] The social worker noted that Father failed to report for the drug test. Father disputes this. He claims he arrived at a drug testing location on March 18, 2021 but was unable to test because the Agency had an outstanding bill due. To confirm Father's claim, the social worker contacted two drug testing locations used by the Agency. According to the testing location where the social worker submitted Father's drug test authorization, Father did not show up on March 18. The other testing location could not confirm if Father showed up, but did report they do need payment before the drug test is taken.

On March 22, 2021, the Agency filed a dependency petition on behalf of J.M. pursuant to Welfare and Institutions Code[4] section 300, subdivision (b). The Agency alleged that J.M. suffered, or there was a substantial risk that he will suffer, serious physical harm or illness without the juvenile court's protection due to Mother's substance abuse and Father's inability to protect J.M. from Mother's substance abuse.

In its detention report, the Agency stated J.M. was being removed from Mother due to her substance abuse and addiction. The Agency also reported that it considered placement with Father, the noncustodial parent. It had "attempted to engage the father in creating a safety plan for the baby once discharged" and had made "multiple efforts to engage the father and assess his capability of protecting [J.M.] from the [M]other's substance abuse and ensuring safety." But "[F]ather lacked follow through in addressing the [Agency's] concerns," including purportedly failing to show up to a drug test, "raising the concern he too may be engaging in substance use hindering his ability to protect and meet [J.M.'s] basic needs." In addition, Father's failure to provide his current address and contact information rendered it "difficult to assess [his] capability to be a protective parent at this time." Despite these challenges, the Agency stated that "[u]pon the father making himself readily available to the Agency," it would conduct "a full assessment on his ability to provide adequate care and supervision" to J.M. for placement, visitation, and services once he "elevates his paternity."[5]

---

[4]    All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[5]    Father signed the voluntary declaration of parentage (VDOP) at the hospital and both parents reported to the Agency on March 18, 2021, that he was J.M.'s biological parent. Except under circumstances that are not

At the detention hearing on March 23, 2021, Father requested the juvenile court deem him a presumed father pursuant to Family Code section "7576"[6] and that J.M. be detained in his care. The court accepted the parents' representation that the VDOP was completed at the hospital and deemed Father the "presumed" parent pending verification.

Father then challenged several portions of the detention report, beginning with the contention that he lives with Mother. Father insisted "[t]hey don't live together. They're not in a relationship." Then, other than a vandalism charge in 2006, Father highlighted that he had a clean record with no history of substance abuse, no history of domestic violence, and no history of involvement with CWS. Father also disputed the claim that he did not appear for a drug test on March 18, 2021. He indicated he was willing to work with the social worker and was willing to drug test that day.

The Agency doubted Father's claim that he was willing to work with the social worker. It noted that social workers had made "great efforts to communicate with the father, to track him down, to find out where he lives," to no avail, and that "Father didn't provide any means for the Agency to confirm where he would be living, and how he would be providing, and whether the mother was, in fact, going to live with them." The Agency

applicable here, "a completed voluntary declaration of parentage that complies with this chapter and that has been filed with the Department of Child Support Services is equivalent to a judgment of parentage of the child and confers on the declarant all rights and duties of a parent." (Fam. Code, § 7573, subd. (d).) But because the VDOP had not yet been filed with the Agency, the dependency petition identified Father as the "presumed" father.

[6] Section 7573—rather than section 7576—of the Family Code governs the process by which parentage may be established through a VDOP. Section 7576 addresses challenges to a VDOP after the period of rescission provided in section 7575 expires.

reiterated its concerns from the detention report, namely, that Father was "having frequent and consistent contact in a relationship with the Mother" during a time when she claimed to have been using heroin daily. He claimed lack of insight into Mother's substance abuse and the parents' stated intention to reside together concerned the Agency enough to "want further evaluation of [Father's] situation."

Father responded that, with J.M. still in the NICU, "that would actually give [Father] and the social worker time to be clear and to make a plan for all that," including conducting a home visit and testing Father for drug use. He requested that J.M. be detained with him upon discharge because there was no evidence that J.M. would be in harm's way if placed in Father's care.

The juvenile court disagreed. It rejected Father's contention that J.M. would not be harmed in his care. Noting that J.M. was born addicted to dangerous drugs and born a month prematurely, the court stated: "There wasn't any intervention undertaken by the father prior to the birth of the child. So I think the inability to protect from mother's drug usage has been proven." It also agreed with the Agency's concerns regarding Father's judgment, as evidenced by his agreement with Mother to leave the hospital against medical advice. The court then made a prima facie finding on the petition, ordered J.M. detained once released from the hospital in a licensed resource home, an approved relative home, or Polinsky Children Center, and granted the parents liberal supervised visitation.

B.   *The Agency's Attempts to Assess Father for Placement of J.M.*

Pending the jurisdiction and disposition hearing, the Agency continued its attempts to assess Father for placement of J.M. in his care and supervision. Father drug tested on March 24, 2021, which was negative, and

7

he invited the social worker to his home. After observing two bassinets and a diaper box in the home, the social worker and Father discussed his recent behavior. Father explained that when the social worker arrived at his home previously, Mother was with him in the house. He understood this could "jeopardize the investigation," but he felt "obligated to take care of her" because he was concerned for her health after the cesarean section and because he is a "softy." He then provided information for family members that the social worker had previously requested. The social worker explained to Father the importance of following through with sending important information to her and drug testing when asked in light of the Agency's concerns about his potential drug use and ability to protect J.M.

On March 25, 2021, Father provided additional information to the social worker and said that he "kicked himself in the butt" for not cooperating with the Agency sooner. However, the following day, Father "appeared to be hesitant and nervous" when the social worker asked him to drug test. He agreed to go but did not get tested that day. The social worker then asked for a drug test on March 29 but Father stated he was not willing to go and would need to speak to his attorney. On April 1, 2021, the social worker asked Father if he had spoken with his attorney yet about getting drug tested, but Father claimed he retained a new attorney and would need to speak to him. On April 6, the social worker called Father and left a voicemail message for him to call her back. He texted her to say that he was working and would call her on a break, but he did not call.

The social worker and Father communicated by text messages for the next two days and did not speak again until April 8, 2021, when the social worker asked for a meeting so that she could interview him. Father appeared at the CWS office on April 9 where he wore his sunglasses inside the building

the majority of the time.  His eyes, which were visible to the social worker through the gap on top, "appeared to become heavy, he was slower to blink and it appeared harder for him to keep his eyes open."  Toward the end of the interview, Father's words "came out slower and he took longer pauses between his words and sentences."  The social worker again expressed her concerns to Father about his unwillingness to take random drug tests.  When she asked him to drug test that day, he declined.  Father also reported he was prescribed hydrocodone which he took as needed for pain, though he claimed it had been a "pretty long time" since he last used the medication.  Father refused to provide a medical release for the social worker to obtain a copy of the prescription but said he would send a picture of it to her.

On April 14, 2021, Father texted the social worker expressing his preference to communicate by text message or email only.  The social worker then contacted Father nine times through text messages and telephone calls over the course of the following three weeks asking for a call back, but Father never called.  They finally spoke again on the phone on May 17, 2021, when the social worker updated Father on J.M.'s condition.  She then asked for the hydrocodone prescription, but Father "appeared to become distracted and stated there was an accident up ahead."  Father said he would call the social worker back, but he did not.  The social worker called Father again on May 18 and left a voicemail asking for a call back.

In addition to failing to provide the Agency with the alleged prescription for his hydrocodone use and the difficulties in communicating with the Agency, the Agency noted other concerning behavior.  For example, Father visited J.M. at the hospital during "odd hours":  once at 1:00 a.m., another time at 2:00 a.m., and a third time at 12:45 a.m.  Of the Agency's seven requests to drug test, he tested only twice.  While the results of the

9

first test from March 24 were negative, his behavior at the second drug test on June 2 broke protocol and raised suspicions that he was not providing a fresh urine sample. The sample collector at the testing site reported that Father appeared nervous, refused to face him, and refused to do an oral swab test. He suspected Father "was squeezing something out of his private parts" after noticing a lot of movement in Father's genital region. Father refused to let the sample collector observe the urine test as required by protocol. The urine sample that Father then provided was not at temperature. The sample collector reported that the results of this test would likely be canceled due to Father's failure to follow protocol.

There were also several reports that the parents continued to interact with one another despite Father's claim that he had no interest in being with Mother anymore. As noted, the parents told the social worker they were working on their relationship for J.M. and were looking for a place to live together. Mother reported, however, that the parents' goal was "to get back together." The maternal aunt also informed the social worker that there were Venmo money exchanges between the parents with titles such as "date night." The parents even visited J.M. at the hospital together at least twice. They attended an online child and family team (CFT) meeting together on April 2, 2021, during which the social worker observed that Mother was visibly under the influence of drugs. Both parents refused to drug test at the social worker's request.

C.    *Contested Jurisdiction and Disposition Hearing*

The contested jurisdiction and disposition hearing was heard on June 4, 2021. The Agency recommended that J.M. be removed from Mother (the custodial parent) and that he not be placed with Father (the noncustodial parent) as it would be detrimental to J.M. In its reports, the Agency

10

expressed "serious concerns" about Father engaging in drug use based on his repeated refusals to randomly drug test and based on his refusal to provide his prescription for hydrocodone. His behavior at the CWS office was also troubling, as was his continued interactions with Mother.

The court received the Agency's detention and jurisdiction/disposition reports into evidence and heard testimony from the primary social worker and Father. The social worker testified to the contents of the Agency's reports and to the Agency's concerns with Father. While she expressed no concerns with Father's home, she declined to recommend placement with Father because of the concerns about his suspected drug use and because of his inability to maintain boundaries with Mother.

During his testimony, Father denied he was in a relationship with Mother. Though he acknowledged she stayed with him after she gave birth, he clarified that this was because there was no one else in California to help her during her recovery. Father denied he and Mother planned to visit J.M. at the hospital together, claiming their joint presence there was unintentional. Regarding the interview at the CWS office, Father claimed he wore sunglasses inside the building because he was merely protecting his eyes after just coming from a roofing job that required him to work atop sheet metal.

After closing arguments, the juvenile court made a true finding on the petition by clear and convincing evidence that J.M. comes within section 300, subdivision (b). It found that Mother's use of opiates was undisputed, as was the effect of her substance abuse on J.M., and removed J.M. from Mother pursuant to section 361, subdivision (c)(1).

The juvenile court then considered whether J.M. should be placed with Father, the noncustodial parent requesting custody. The court found that

11

Father's failure to drug test despite the Agency's multiple requests was "particularly concern[ing] but in a way not really surpris[ing]" due to the concerns about Father's potential drug use. Although Father did provide a urine sample at the most recent drug test, the court was concerned by his behavior in breaking testing protocols and the fact that the urine sample was not at temperature. The court also considered Father's odd behavior during the CWS office visit and his refusal to provide the Agency with the alleged hydrocodone prescription. The court considered the "totality of the[se] circumstances" and determined that "placement with the father at this time would be detrimental" to J.M. It ordered J.M. to be placed in a foster home and granted the parents liberal supervised visitation. Father timely appealed.

## DISCUSSION

On appeal, Father asserts the court erred, first, by finding true the allegation that he abused drugs and, second, by removing J.M. from his custody without sufficient evidence that J.M. would be in substantial danger and without consideration of reasonable alternatives to removal. Father also asserts the juvenile court abused its discretion by limiting him to supervised visitations. Father's characterizations of the proceedings below are not accurate. He has failed to recognize the juvenile court took jurisdiction of J.M. based on Mother's substance abuse, removed him from Mother's custody, and made a detriment finding to deny placement with Father. Substantial evidence supports these findings and order by the juvenile court.

A.    *Juvenile Court Did Not Abuse Its Discretion in Its Jurisdiction and Disposition Order*

"The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 (*In re I.A.*).) "The general rule is that

12

'the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition.'" (*In re M.R.* (2017) 7 Cal.App.5th 886, 896 (*In re M.R.*).)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see *In re I.C.* (2018) 4 Cal.5th 869, 892.) However, "[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580.)

We begin our analysis with Father's requested relief. Father argues the juvenile court's alleged jurisdictional errors require us to return custody of J.M. to him and to terminate jurisdiction. We disagree. As the Agency correctly points out, the juvenile court takes jurisdiction over a child under section 300, not over each individual parent. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492.) So long as the Agency can show, by a preponderance of the evidence, that any one of the statutory bases for jurisdiction set forth in the petition is true, then jurisdiction is proper. (§ 355 ["Proof by a preponderance of evidence must be adduced to support a finding that the

13

minor is a person described by Section 300."]; *In re M.R.*, *supra*, 7 Cal.App.5th at p. 896.)

In this case, the Agency sought jurisdiction over J.M. pursuant to section 300, subdivision (b)(1). A child comes within the juvenile court's jurisdiction under that provision if the Agency can show: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) Father does not dispute that Mother's substance abuse was a sufficient, independent basis for the juvenile court to assume jurisdiction over J.M. Thus, even if we agreed with Father that any findings as to *him* are untenable, this would not require reversal of the juvenile court's jurisdictional order. (See *In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492.)

However, we acknowledge (as the Agency concedes) that we may proceed to the merits of Father's jurisdictional arguments if he can show: "(1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.)

Father argues these conditions have been met because the erroneous jurisdictional findings have the potential to affect him in the current and in future dependency proceedings. Assuming this to be true, we turn to Father's jurisdictional arguments. He asserts the juvenile court erred by basing its jurisdictional findings on mere suspicion of drug use. He further argues the evidence was insufficient to support the finding that J.M. faced a substantial risk of serious physical harm if he remained in Father's custody, and the trial

14

court failed to consider reasonable alternatives to removal. In support, Father relies on several cases involving *removal from a custodial parent* suspected of drug use. (See, e.g., *In re L.C.* (2019) 38 Cal.App.5th 646, 652–654 [legal guardian's sporadic methamphetamine use outside the home while child was with a competent caretaker was insufficient to support jurisdiction]; *In re Drake M.* (2012) 211 Cal.App.4th 754, 768–769 [custodial parent's use of medical marijuana insufficient to support finding that it placed the child at substantial risk of serious physical harm or illness to warrant jurisdiction].)

As we have noted, Father's argument is fundamentally flawed because it misapprehends the juvenile court's findings and order. The first flaw is that the juvenile court's jurisdictional findings and order were based on *Mother*'s substance abuse and Father's inability to protect J.M. from Mother's substance abuse.[7] The juvenile court did not make any jurisdictional findings as to Father's alleged drug use.

The second flaw in Father's argument is that "removal" under the juvenile dependency statutory scheme refers to the physical removal of the child from the custodial parent(s). (See § 361, subd. (c) ["A dependent child shall not be taken from the physical custody of his or her parents, guardian or guardians, or Indian custodian with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive, and, where it is known or there is reason to know that the child is an Indian child, as defined by Section 224.1, paragraph (6)."].) Here, the juvenile court found Father did not reside with J.M. when the petition was

---

7      Father asserts no claim of error as to either of these findings.

filed. J.M. therefore was not "removed" from Father's "custody" because Father never had custody.

In sum, Father has mischaracterized the proceedings below.[8] The juvenile court did not make jurisdictional findings as to him, and J.M. was not removed from his custody. What the juvenile court did do is remove J.M. from Mother's custody pursuant to section 361, subdivision (c). When a juvenile court orders removal of a child from the custodial parent, it must determine whether there is a noncustodial parent who wants to assume custody. (§ 361.2, subd. (a).) Having identified Father as the noncustodial parent requesting custody, the juvenile court was required to "place [J.M.] with [Father] unless it [found] that placement with [Father] would be detrimental to the safety, protection, or physical or emotional well-being of [J.M.]" (*Ibid.*) A finding of detriment must be made by clear and convincing evidence. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829.)

In assessing detriment, the juvenile court must "examin[e] . . . the circumstances of the parent and child" (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1503, 1506), although "the focus in dependency law [is] on the child, not the parent" (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425 (*Luke M.*)). (See generally § 300.2 ["The focus [of dependency law] shall be on the preservation of the family as well as the safety, protection, and physical

---

8       We recognize that Father's misunderstanding may have been compounded by imprecise language used at the contested jurisdiction and disposition hearing. For example, during closing arguments, counsel for the Agency asked the court to follow its recommendation to "remove" J.M. from Father. In fact, the Agency had recommended that "placement" with Father be denied. Similarly, the juvenile court, which purported to adopt the Agency's recommendations, ordered removal "from the custody of the *parents*." (Italics added.) But the Agency only recommended that J.M. be removed from one parent: Mother. These misstatements do not alter the nature of the juvenile court's findings and order.

16

and emotional well-being of the child"].) Because "[a] detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm," no one factor can be dispositive. (*Luke M.*, at p. 1425.) We review the juvenile court's finding of detriment for substantial evidence, "bearing in mind the heightened burden of proof" in the trial court. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

We conclude there was substantial evidence to support the juvenile court's finding by clear and convincing evidence that it would be detrimental to J.M. if he was placed with Father. The court based its finding on Father's inability to set boundaries with Mother and strong circumstantial evidence of his drug use. As to the former, there was no dispute that Mother's substance abuse resulted in severe harm to J.M., including a premature birth and a two-month stay in the NICU as he underwent methadone treatment. The record revealed that Mother continued to abuse drugs after giving birth and refused to drug test. Despite Father's claim that their relationship ended because of her substance abuse, there was evidence that the parents were working on their relationship and were looking for a place to live together. They visited J.M. at the hospital together multiple times, Father supported Mother's decision to leave the hospital against medical advice, and Father took care of Mother after the caesarian section. Father described himself as a "softy" and was willing to lie to the social worker about his address to hide his continued interactions with Mother. Further still, Father was with Mother at a CFT meeting where Mother was visibly under the influence of drugs.

Father's own behavior also caused the Agency to have concerns about his potential drug use. Father is correct that there was no direct evidence that he used drugs, and we note this fact is due to his repeated refusal to test.

17

But evidence can come in two forms: direct and circumstantial. " '[D]irect evidence' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (Evid. Code, § 410.) Circumstantial evidence, on the other hand, is "nothing more than one or more inferences which may be said to arise reasonably from a series of proven facts. [Citations.]" (*Hatfield v. Levy Bros.* (1941) 18 Cal.2d 798, 805; see Evid. Code, § 600, subd. (b).) "[T]he fact that evidence is 'circumstantial' does not mean that it cannot be 'substantial.' " (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 548, overruled on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) Regardless whether the evidence is direct or circumstantial, the same standard of review applies to a challenge to the substantiality of the evidence. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Here, there was ample circumstantial evidence from the record before us to support the court's detriment finding based on concerns of Father's drug use. " ' "[W]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]." ' [Citation.]" (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.) As the juvenile court found, Father repeatedly refused the social worker's requests for drug tests. Of the two times that he did test, Father's behavior at the second test caused the collector to question whether he was submitting a fresh urine sample. Father was also evasive about his hydrocodone use and declined to provide a prescription despite repeated requests for it. Lastly, his behavior at the CWS office, including wearing sunglasses inside the building to hide his eyes and his slowed speech, supports the reasonable inference he was under the

18

influence of some substance. The court was entitled to rely on the totality of this evidence, even if circumstantial, in making its determination.

Father counters with evidence in the record that his home was adequate, he was employed, and he had positive interactions with J.M. during his visits. Even so, if substantial evidence is present, we must affirm the court's order; our task is not to reweigh conflicting evidence. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020.) Furthermore, we presume that the juvenile court considered all of the evidence in finding that it would be detrimental to J.M. for him to be placed with Father. (Cf. *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [trial court's judgment or order is presumed correct].)

B.   *Juvenile Court Did Not Abuse Discretion in Ordering Supervised Visitations*

Father also argues the juvenile court abused its discretion in ordering supervised visitations. Visitation is " 'an essential part of a reunification plan.' " (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 517.) During reunification efforts, visitation generally must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A).) "Visitation orders in dependency cases are typically reviewed for abuse of discretion and will not be reversed absent a 'clear showing of an abuse of discretion.' [Citation.]" (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1119.) Under that standard, "[w]e will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) " ' "The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child." ' " (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186–187.) Father has not demonstrated that the juvenile court's visitation order constituted an abuse

19

of discretion.  He was granted liberal supervised visitation, which we conclude was sufficient for the reasons discussed.

## DISPOSITION

The order of the juvenile court is affirmed.


DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


GUERRERO, J.